REDMOND v VAN BUREN COUNTY

Docket No. 297349. Submitted July 7, 2011, at Grand Rapids. Decided
July 21, 2011, at 9:00 a.m. Leave to appeal denied, 491 Mich 913.

In this case arising out of a land dispute, Robert Redmond, Thomas R.
Tibble, and Patti L. Tibble, brought an action in the Van Buren
Circuit Court against Van Buren County and others, seeking access to
their properties in the Syndicate Park subdivision in South Haven
Township. Redmond ultimately settled and was no longer a party.
The Tibbles had purchased several lots in Syndicate Park in 1995.
The Tibbles were able to access their undeveloped property through
a gated access drive on Lots 1 through 4 of Block 21 of the
subdivision. On September 4, 1956, Dwight and Alice Porter had
attempted to convey Lots 1 through 4 of Block 21 to the Sand Haven
Voluntary Association, and its members used the gated drive to access
their properties. The Tibbles, however, were never invited to join the
association. Nonetheless, the Tibbles were provided access through
the gate by key from 1995 until either 2002 or 2003. In 2006, a new
electronically operated gate was installed on the access drive. The
Tibbles were not given either the remote or the code necessary to
operate the gate. Because the Tibbles were no longer able to use the
gate, they were unable to access their property from a developed road.
The Tibbles sought to open access through undeveloped roads in the
subdivision, but permission was refused by the Department of
Environmental Quality. In the suit, the Tibbles asserted that they
had a right to access their property through the gated drive by way of
easement by prescription, implication, or necessity. In an amended
complaint, the Tibbles asserted that the Porters' conveyance of Lots
1 through 4 to the Sand Haven Voluntary Association created either
a public or private dedication, and thus an easement, over Lots 1
through 4. Following a bench trial, the court, William C. Buhl, J.,
entered a judgment of no cause of action. The court found that there
was no basis to find title by conveyance in the association or its
individual members, that there had been no public dedication of the
access lots, but that the named individual defendants could claim a
private dedication from the Porters for their benefit in light of the
their use and maintenance of the access drive for more than fifteen
years. It also found that the Tibbles had not so used the drive for
fifteen years and had no easement. The Tibbles appealed.

The Court of Appeals *held*:

1. The requirements for a public common-law dedication also apply to a private common-law dedication. Those requirements are an intent to dedicate, acceptance and maintenance, and use. In this case, the Porters' deed to the Sand Haven Voluntary Association demonstrated that they intended to dedicate Lots 1 through 4 for private use. The evidence established that individuals in the subdivision accepted, maintained, and used the lots in accordance with that intent. Accordingly, the trial court did not err when it found that the Porters' failed conveyance to the association created an irrevocable easement in the lots by virtue of a private dedication.

2. The grantor's intent controls the scope of the dedication. For a common-law dedication, such intent can be gathered from all of the facts and circumstances bearing on the question. The facts of this case demonstrated that the Porters intended to dedicate the use of Lots 1 through 4 to all lot owners in Syndicate Park whose only means of accessing their property by land was through Lots 1 through 4. Notably, the Tibbles' predecessor in interest had key access through the gate and the Tibbles had access through the gate until at least 2002, indicating that all landowners in the subdivision, regardless of their membership status with the Sand Haven Voluntary Association, used Lots 1 through 4 for access until the association required its members to pay dues in 2002 or 2003. Accordingly, the Tibbles, like the individual named defendants had an easement in Lots 1 through 4 by virtue of the Porters' private dedication and the defendants cannot prevent the Tibbles from using their easement.

Reversed and remanded.

1. PROPERTY — COMMON-LAW DEDICATION — PRIVATE — REQUIREMENTS.

As with a public common-law dedication of land, a private common-law dedication of land requires: (1) an intent of the owners of property to offer the property for use to the private individuals, (2) acceptance of the owners' offer and maintenance of the property by the private individuals, and (3) use of the property by the private individuals.

2. PROPERTY — COMMON-LAW DEDICATION — PRIVATE — SCOPE — GRANTOR'S INTENT.

The grantor's intent controls the scope of a private common-law dedication of land; for a common-law dedication, that intent can be gathered from all of the facts and circumstances bearing on the question.

*Hann Persinger, P.C.* (by *Richard D. Persinger*), for Thomas R. and Patti L. Tibble.

*Schuitmaker, Cooper, Schuitmaker, Cypher & Knotek, P.C.* (by *Harold Schuitmaker*), for Van Buren County.

*Kelly L. Page* for the Sand Haven Shores Homeowners Association, Walter W. Goodrich, and others.

Before: SAWYER, P.J., and WHITBECK and OWENS, JJ.

PER CURIAM. Plaintiffs Thomas and Patti Tibble[1] appeal as of right the trial court's order dismissing the Tibbles' cause of action. This case arises out of a land dispute regarding the Tibbles' right to access their property located in Block 20 of the Syndicate Park subdivision (Syndicate Park). The Tibbles own five lots within Syndicate Park and are seeking to access those lots via Lots 1 through 4 of Block 21, upon which there is a locked gate. We reverse.

I. FACTS

Syndicate Park is in South Haven Township, Michigan. The west side of Syndicate Park abuts Lake Michigan. St. Joseph Avenue is a jagged road that runs roughly north/south, lies to the east of the subject parcels, and is an unimproved road with a gravel base. Drexel Boulevard runs east/west, north of Block 21 and south of Block 20. Lakeside Avenue runs parallel to Drexel Boulevard, north of Block 20 and south of Block 19. Both Lakeside Avenue and Drexel Boulevard are described as undeveloped, "heavily wooded," and "pretty rugged." Testimony indicated that it would be

---

[1] Plaintiff Robert Redmond reached a settlement and is no longer a party to these proceedings.

"challenging" and "expensive" to open Drexel Boulevard and, although opening Lakeside Avenue would not be as challenging, it did have one area of a "steep loft."

According to defendant Paul Hemmeter, the only way to get a vehicle to Blocks 19, 20, and 21 is to go through the gate at Lots 1-4 of Block 21. After passing through the gate, two drives originate on Lots 1-4 of Block 21. The first drive goes west through the properties of Block 21 (the properties of defendants Walter Goodrich, Darren and Lara Malek, Steve Evans, and Richard Shields) and then intersects Drexel Boulevard, thus, providing access to the properties of Goodrich, Malek, Evans, Shields, and defendant Steven Dombrauskas. The second drive goes northwest through Lots 1-4 of Block 21 and intersects Drexel Boulevard.

On September 4, 1956, Dwight and Alice Porter conveyed Lots 1-4 of Block 21 of Syndicate Park to defendant Sand Haven Voluntary Association.

In 1971, defendants Edward and Alice Palmer purchased a home in Syndicate Park on Lots 13-19 and 62-68 in Block 20. At the time of their purchase, there was a padlocked gate on Lots 1-4 in Block 21. A "roadway" went through the gate. According to Edward Palmer, he was uncertain whether Syndicate Park had a homeowners' association when he purchased his property. However, he began to pay membership dues to the Sand Haven Voluntary Association in either 2002 or 2003.

In 1987, defendant Steve Evans purchased several groups of lots for a seasonal home in Syndicate Park, including Lots 20-29 in Block 21. According to Evans, he was a member of the Sand Haven Voluntary Association, and he paid membership dues. Indeed, at one time, Evans was the Sand Haven Voluntary Association's treasurer. As the treasurer, Evans received tax

bills for Lots 1-4 in Block 21 because he "never could get the county to make . . . the taxes to the association." Evans paid the taxes with "association money."

In February 1988, defendant Paul Hemmeter purchased a home in Syndicate Park on Lots 26-55 in Block 20. At the time of his purchase, there was a small metal gate with a lock and pin on Lots 1-4 of Block 21. According to Hemmeter, each member of the Sand Haven Voluntary Association had a key to the gate. In 1990, Hemmeter purchased Lots 69-72 in Block 20 and also lots in Block 19.

According to Hemmeter, there was a "common understanding" that all members of the Sand Haven Voluntary Association could use the drives. Moreover, Hemmeter stated that he became a member of the Sand Haven Voluntary Association because he purchased his property from a member of association. Indeed, according to defendants, membership in the Sand Haven Voluntary Association transferred automatically when a member of the Sand Haven Voluntary Association transferred title to property in Syndicate Park.

In 1995, the Tibbles purchased Lots 8-12, 21-25, and 56-61 in Block 20 of Syndicate Park. At the time of purchase, the seller of the property provided the Tibbles with a key to the gate on Lots 1-4 of Block 21. According to Thomas, the lock on the gate would periodically change. Either Evans or the property caretaker would provide the Tibbles with a new key. According to Thomas, the Sand Haven Voluntary Association did not ask him to become a member. The Tibbles did not receive correspondence from the Sand Haven Voluntary Association or pay dues. The Tibbles later sold Lots 21-25 and 56-61 to Robert Redmond but retained Lots 8-12. In either 2002 or 2003, the Tibbles were no longer provided a key to the gate.

In May 2006, Evans applied for a permit to install a new gate on Lots 1-4 of Block 21. During the summer of 2006, an electronically operated cantilever gate was installed. The gate could be opened in two ways: either by entering a code on a keypad or by remote control. All members of the Sand Haven Voluntary Association received remote controls and a permanent code. Utility companies received a semipermanent code. And guests of members of the Sand Haven Voluntary Association received a temporary code, which changed every few months. The Tibbles, however, did not receive access through the gate. According to Thomas Tibble, the Tibbles therefore no longer had access to their property in Syndicate Park.

On August 29, 2006, Dombrauskas filed articles of incorporation for the Sand Haven Shores Homeowners Association. The articles listed Dombrauskas as the Sand Haven Shores Homeowners Association's agent. The articles stated that the purpose of the Sand Haven Shores Homeowners Association was to provide for routine maintenance and upkeep of property.

According to Hemmeter, the Sand Haven Shores Homeowners Association consisted of the following families: Hemmeter, Goodrich, Evans, Shields, Dombrauskas, Atkinson, and Palmer. Hemmeter testified that there were no written procedures governing how a person became a member of the Sand Haven Voluntary Association or how a person becomes a member of the Sand Haven Shores Homeowners Association. Nonetheless, Hemmeter testified that nonmembers who purchased property from members could become members of the Sand Haven Shores Homeowners Association by paying a $1,500 transfer fee. And, according to defendants, nonmembers who purchased property from nonmembers could become members of the Sand Haven

Shores Homeowners Association by paying an initiation fee. The amount of the initiation fee was to be determined by the Sand Haven Shores Homeowners Association. Moreover, according to Hemmeter, the Sand Haven Shores Homeowners Association had annual $600 membership dues.

In 2006 and 2007, the Maleks purchased Lots 9-19 in Block 21 of Syndicate Park. The Maleks paid the $1,500 transfer fee to become members of the Sand Haven Shores Homeowners Association and to access their property. The Maleks paid additional membership dues in 2007 and 2008 of $600 and $700 respectively.

According to Thomas Tibble, the Sand Haven Shores Homeowners Association did not ask him to become a member. The Tibbles did not receive correspondence from the Sand Haven Shores Homeowners Association or pay dues to the homeowners' association. Hemmeter confirmed that the Tibbles were not offered membership to the Sand Haven Shores Homeowners Association.

The Tibbles applied to the Department of Environmental Quality to open access to Lakeside Avenue and Drexel Boulevard from St. Joseph Avenue. But the Department denied the Tibbles' request.

On September 13, 2007, the Tibbles sued defendants to obtain access to their property in Syndicate Park through the electronic gate. The Tibbles hope eventually to build a home on their property in Syndicate Park. The Tibbles claimed an easement in the private drive entering Syndicate Park through the gate on Lots 1-4 under the theories of prescription, implication, and necessity.

After the plaintiffs proofs were presented at the July 2008 bench trial, the trial court determined that the Sand Haven Voluntary Association was a necessary party that had not been included as a defendant in the

case. Accordingly, the trial court directed the Tibbles to add Sand Haven Voluntary Association as a defendant. The trial court also granted defendants' motion to dismiss the counts of the Tibbles' complaint claiming an easement by implication and necessity.

The Tibbles filed an Amended and Restated Complaint, adding Sand Haven Voluntary Association and the unknown heirs of the Porters as defendants. The Tibbles' complaint retained their claim of an easement by prescription. However, the Tibbles' added two counts, claiming that the Porter's conveyance of Lots 1-4 to the Sand Haven Voluntary Association created either a public or a private dedication and, thus, an easement over Lots 1-4.

After a second bench trial proceeding, the trial court issued an opinion and order. With respect to Lots 1-4, the trial court opined that it had "no basis to find title by conveyance in the [Sand Haven Shores Homeowners Association] or its individual members." The trial court also opined that the Porters did not make a public dedication of Lots 1-4. However, the trial court found that defendants could "claim a private dedication for their benefit . . . from the Porters" because they used and maintained Lots 1-4 and erected the gates. The trial court noted that the individual defendants and their predecessors traveled Lots 1-4 for more than 15 years, but the Tibbles did not. The trial court also viewed the Porters' deed to the Sand Haven Voluntary Association as acquiescence to the defendants' use. The trial court summarized its conclusion as follows:

> It is the conclusion of the Court that the individual Defendants have, by private dedication by means of the Porters' deed, and/or by prescription and/or acquiescence an easement over Lots 1-4, Block 21 of South Haven Syndicate Park Sub-Division, and that the Plaintiffs have no such an [sic] easement.

The trial court entered a judgment of no cause of action and specifically found that defendants had the right to erect and maintain the gate at Syndicate Park. The Tibbles now appeal the trial court's judgment.

## II. PRIVATE DEDICATION

### A. STANDARD OF REVIEW

The Tibbles argue that the trial court erred by determining that the individual defendants and the Sand Haven Shores Homeowners Association acquired a right by private dedication to access their lots in Syndicate Park, while holding that the Tibbles were not included in that private dedication. This Court reviews a trial court's findings of fact following a bench trial for clear error and reviews de novo the trial court's conclusions of law.[2]

### B. LEGAL PRINCIPLES

Michigan law recognizes both public and private dedications.[3] Traditionally, a public dedication was understood as "an appropriation of land to some public use, accepted for such use by or in behalf of the public."[4] Public dedications can be either statutory dedications or common-law dedications.[5] " 'The effect of a [public] dedication under [a] statute has been to vest the fee in

---

[2] *Heeringa v Petroelje*, 279 Mich App 444, 448; 760 NW2d 538 (2008).

[3] See *Little v Hirschman*, 469 Mich 553, 557-563; 677 NW2d 319 (2004) (recognizing the validity of private dedications); *Badeaux v Ryerson*, 213 Mich 642, 646-647; 182 NW 22 (1921) (recognizing the validity of public dedications).

[4] *Clark v Grand Rapids*, 334 Mich 646, 656-657; 55 NW2d 137 (1952); see also *Little*, 469 Mich at 557 n 4.

[5] *Boone v Antrim Co Bd of Rd Comm'rs*, 177 Mich App 688, 693; 442 NW2d 725 (1989); see also *Little*, 469 Mich at 557 n 4.

the county, in trust for the municipality intended to be benefited, whereas, at common law, the act of dedication created only an easement in the public.' "[6] "Generally, a valid statutory dedication of land for a public purpose requires two elements: (1) a recorded plat designating the areas for public use; and (2) acceptance by the proper public authority."[7] A valid common-law dedication of land to the public requires the following elements: (1) an intent of the owners of property to offer the property to the public for use, (2) acceptance of the owners' offer by public officials and maintenance of the property by public officials, and (3) use of the property by the public generally.[8] "Neither a grant nor written words are necessary to render the act of dedicating land to public uses effectual at common law; intent to dedicate can be gathered from the circumstances."[9] As the Michigan Supreme Court recently stated, "With regard to an intention to dedicate, all facts and circumstances bearing on the question are considered."[10]

With respect to private dedications, the Michigan Supreme Court, in the cases of *Little v Hirschman*[11] and *Martin v Beldean*,[12] conducted an extensive analysis discussing the origins and this state's acceptance of private dedications. When discussing private dedica-

---

[6] *Little*, 469 Mich at 557 n 4, quoting *Village of Grandville v Jenison*, 84 Mich 54, 65; 47 NW 600 (1890).

[7] *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 113; 662 NW2d 387 (2003).

[8] *Bain v Fry*, 352 Mich 299, 305; 89 NW2d 485 (1958).

[9] *DeWitt v Roscommon Co Rd Comm*, 45 Mich App 579, 581; 207 NW2d 209 (1973).

[10] *2000 Baum Family Trust v Babel*, 488 Mich 136, 148; 793 NW2d 633 (2010).

[11] *Little*, 469 Mich at 557-563.

[12] *Martin v Beldean*, 469 Mich 541, 546-548; 677 NW2d 312 (2004).

tions, the Court did not make an explicit distinction between statutory and common-law dedications. However, the Court noted that courts of this state had recognized private dedications before private dedications were first statutorily recognized in the 1925 plat act[13] and later again in the Land Division Act,[14] i.e., the plat act of 1967.[15] With regard to private dedications from 1835 to 1966, the Court stated that such dedications of land "in a recorded plat" gave the grantees of the private dedications "at least an irrevocable easement in the dedicated land."[16] And, with regard to private dedications "in [a] plat" after the effective date of the Land Division Act—January 1, 1968—the Court stated that such a private dedication conveyed a fee interest.[17] Thus, on the basis of *Martin* and *Little*, this Court has opined that a private dedication in a plat made before January 1, 1968, conveys an irrevocable easement, whereas a private dedication in a plat after January 1, 1968, conveys a fee interest.[18] There does not appear to be any legal authority addressing private dedications that are not in a plat, that is, private dedications that are akin to common-law public dedications.

In a 1921 case, the Michigan Supreme Court determined that a common-law public dedication arose out of a deed—which the Court determined to be void—that attempted to convey property to a nonlegal entity.[19] In *Badeaux v Ryerson*, Louis Badeaux conveyed by war-

---

[13] 1925 PA 360.

[14] MCL 560.101 *et seq.*

[15] *Little*, 469 Mich at 559; *Martin*, 469 Mich at 546-548.

[16] *Little*, 469 Mich at 561-562, 564.

[17] *Martin*, 469 Mich at 547-549.

[18] *Beach v Lima Twp*, 283 Mich App 504, 510; 770 NW2d 386 (2009).

[19] *Badeaux*, 213 Mich at 646-647.

ranty deed a parcel of land known as the "Indian burying ground" to the "Ottawa Tribe of Indians" in 1841.[20] After the conveyance, Indians, Badeaux's heirs, and others were buried on the land, which was enclosed with a fence and marked with a large white cross.[21] In 1853 and 1856, however, Badeaux conveyed the same land to other persons, who then conveyed the land to the defendant.[22] The defendant and the heirs of Badeaux (the plaintiffs) both asserted that the 1841 conveyance to the Ottawa Tribe of Indians was void and claimed title to the land.[23] The Court held that the 1841 deed was ineffective to convey title to the Ottawa Tribe of Indians.[24] The Court also held that title to the land passed to the defendant but was nonetheless subject to an easement held by the public for purposes of using the land as a cemetery by virtue of a common-law dedication.[25] The Court emphasized that the public used the land as a cemetery with the consent of the owner both before and after the failed conveyance and had not surrendered the easement.[26] The Court explained that a common-law dedication need not be in writing and that "dedications have been established in every conceivable way by which the intention of the dedicator could be evinced."[27]

## C. APPLYING THE LEGAL PRINCIPLES

In the present case, the trial court found that the Porters' failed conveyance to the Sand Haven Voluntary

[20] *Id.* at 644.

[21] *Id.* at 644-645.

[22] *Id.* at 645.

[23] *Id.*

[24] *Id.* at 647.

[25] *Id.* at 646-647.

[26] *Id.*

[27] *Id.* at 647.

Association created an easement in Lots 1-4 by virtue of a private dedication. The trial court's finding is analogous to the Michigan Supreme Court's decision in *Badeaux*. Both *Badeaux* and the present case involved failed conveyances of land to nonlegal entities.[28] And, in both *Badeaux* and the present case, private individuals used and maintained the land at issue (that is, the cemetery in *Badeaux* and Lots 1-4 in the present case, respectively) both before and after a failed conveyance.[29] The only difference between *Badeaux* and the present case is that the cemetery in *Badeaux* was used by the public and Lots 1-4 in the present case are used by a specific group of private individuals.

As previously noted, there is no legal authority in Michigan addressing private dedications that are not in a plat, that is, common-law private dedications. Nonetheless, applying the requirements for a public common-law dedication articulated by the Michigan Supreme Court (intent to dedicate, acceptance and maintenance, and use) to this case, suggests that a private common-law dedication was established in the present case.[30]

The Porters' deed to the Sand Haven Voluntary Association demonstrates that the Porters intended to dedicate Lots 1-4 for private use. Moreover, the evidence at trial established that private individuals in Syndicate Park accepted, maintained, and used Lots 1-4. The inscription of "1950" on the cement footing of the gate on Lots 1-4 indicates that the gate and the private drives on Lots 1-4 were used by private individuals in Syndicate Park before the Porters' failed conveyance in 1956. Palmer, the earliest resident of

---

[28] See *id.*

[29] See *id.* at 646-647.

[30] See *Bain*, 352 Mich at 305.

Syndicate Park to testify in this case, testified that the gate and private drives on Lots 1-4 were present when he purchased his property in 1971. Hemmeter testified that he maintained the drives after purchasing property in Syndicate Park in 1988. And, there was testimony that the old and new gates on Lots 1-4 were maintained by private individuals in Syndicate Park. Accordingly, we conclude that the trial court did not err when it found that the Porters' failed conveyance to the Sand Haven Voluntary Association created an irrevocable easement in Lots 1-4 of Block 21 by virtue of a private dedication.[31]

The issue of *who* retained the easement by private dedication in Lots 1-4 is a more complicated matter. A grantor's intent controls the scope of a dedication.[32] Defendants contend that this Court should not look outside the four corners of the Porters' deed to the Sand Haven Voluntary Association to determine the intent and scope of the Porters' dedication because the deed unambiguously indicates that the Porters intended to convey Lots 1-4 to the Sand Haven Voluntary Association and, therefore, only to the Sand Haven Voluntary Association's *members*. However, "intent to dedicate [for a common-law dedication] can be gathered from the circumstances."[33] Indeed, "all facts and circumstances bearing on the question are considered."[34]

The facts and circumstances here illustrate that the Porters intended to dedicate the use of Lots 1-4 to all the lot owners of Syndicate Park whose only means of accessing their property by land is through Lots 1-4. Indeed, given the facts of this case, such a conclusion is the most

---

[31] See *id.*; *Badeaux*, 213 Mich at 646-647; *Beach*, 283 Mich App at 510.

[32] *Higgins Lake*, 255 Mich App at 88.

[33] *DeWitt*, 45 Mich App at 581.

[34] *2000 Baum Family Trust*, 488 Mich at 148.

equitable solution. The Porters' failed conveyance to the Sand Haven Voluntary Association indicates intent to benefit the lot owners in Syndicate Park. The private drives originating on Lots 1-4 appear to have been (and still are) the only means to access Blocks 19-22, which indicates an intention to dedicate the use of Lots 1-4 to the lot owners in Syndicate Park who could only access their properties by a right of way over Lots 1-4.

Moreover, the members of the Sand Haven Voluntary Association at the time of the Porters' failed conveyance are unknown. The trial court did not receive any records with respect to the Sand Haven Voluntary Association's members. And the trial court did not receive any records of minutes kept by the Sand Haven Voluntary Association during meetings. It is certainly possible that individuals other than members of the Sand Haven Voluntary Association used and maintained Lots 1-4 after the Porters' conveyance to the Sand Haven Voluntary Association. Indeed, the notion that the use of Lots 1-4 has been limited to members of the Sand Haven Voluntary Association since the Porters' conveyance is highly suspect. Palmer testified that he was uncertain whether a homeowners' association existed at the time he purchased his property in Syndicate Park in 1971. Indeed, although Palmer purchased property in Syndicate Park in 1971—and apparently traveled Lots 1-4—Palmer did not start paying dues to the Sand Haven Voluntary Association until either 2002 or 2003. Evans testified that he purchased his property in Syndicate Park in 1987 and was a member of the Sand Haven Voluntary Association. But he did not pay dues to the Sand Haven Voluntary Association until "much later on."

More importantly, the Tibbles' predecessor in interest had key access through the gate. And the Tibbles

were provided access through the gate on Lots 1-4 from 1995 until either 2002 or 2003. This evidence indicates that all landowners in Syndicate Park—regardless of their membership status with the Sand Haven Voluntary Association—used Lots 1-4 until the Sand Haven Voluntary Association required its members to pay dues in either 2002 or 2003. Thus, the Porters do not appear to have intended the exclusion of any landowners in Syndicate Park Blocks 19-22 from using Lots 1-4 to access their properties.

Accordingly, we conclude that the Porters intended to dedicate Lots 1-4 for the use of the lot owners in Syndicate Park whose only means of accessing their property by land was through Lots 1-4. Thus, we further conclude that the Tibbles, like the defendants, had an easement in Lots 1-4 by virtue of the Porters' private dedication. Accordingly, the defendants cannot prevent the Tibbles from using their easement.[35]

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. The Tibbles, being the prevailing parties, may tax costs pursuant to MCR 7.219.

SAWYER, P.J., and WHITBECK and OWENS, JJ., concurred.

---

[35] See *Murphy Chair Co v American Radiator Co*, 172 Mich 14, 28; 137 NW 791 (1912) ("[T]he owner of [an] easement cannot prevent another, even a trespasser, from using the land, if his use does not impede the free exercise of the right of passage.").